Docket No. 107091.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee v. JEFFREY A. DAVISON, Appellant.

*Opinion filed February 4, 2010.*

JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Thomas, and Karmeier concurred in the judgment and opinion.

Justice Garman specially concurred, with opinion, joined by Justice Burke.

## OPINION

This appeal requires us to determine whether the offense of mob action properly served as the predicate forcible felony for defendant's first degree felony-murder conviction.[1] Citing our decision in *People v. Morgan*, 197 Ill. 2d 404 (2001), defendant contends his felony-murder conviction must be reversed because the charged predicate

---

[1]Defendant was charged with two counts of first degree felony murder (720 ILCS 5/9–1(a)(3) (West 2004)), one count predicated on attempted mob action (720 ILCS 5/8–4(a), 25–1(a)(1) (West 2004)) and the second count predicated on mob action (720 ILCS 5/25–1(a)(1) (West 2004)).

felony conduct arose from and was inherent in the act of murder itself. The appellate court, with one justice dissenting, rejected defendant's challenge to his felony-murder conviction, and affirmed his conviction and sentence. No. 4–07–0679 (unpublished order under Supreme Court Rule 23). For the reasons that follow, we affirm the judgment of the appellate court.

## I. BACKGROUND

The State charged defendant, in the circuit court of Macon County, with five counts of first degree murder of James Norwood, including one count of intentional murder, two counts of knowing murder, and two counts of felony murder. The felony-murder counts were originally predicated on attempted aggravated battery and aggravated battery, respectively, but the State later successfully amended the predicate felonies to attempted mob action and mob action. The felony-murder charges alleged that defendant committed first degree murder while attempting to commit, or while committing, the forcible felony of mob action when he "struck, kicked, and stabbed" the victim, causing his death.

At defendant's trial, it was undisputed that sometime in the early morning hours on December 3, 2005, defendant and three other men searched for the victim. After the group located the victim, they chased him and then fatally beat and stabbed him. Earlier that same morning, between 2:35 a.m. and 2:53 a.m., the victim made four 911 telephone calls in the lobby of the Decatur police station, reporting he was being pursued and threatened by four men. The victim's autopsy showed he died as a result of blood loss from 20 stab wounds, including an abdomen wound that punctured his aorta. The victim also sustained stab wounds and cuts to his head, neck, shoulders, arms, and upper torso.

Defendant was arrested the night of the murder and initially denied involvement. Defendant, however, ultimately confessed in a videotaped statement to law enforcement officials. Police officers recovered from defendant's home a knife and softball bat with the victim's blood. The victim's blood was also found inside defendant's vehicle.

Following the close of the State's evidence, defendant filed a motion for directed verdict on his two felony-murder charges, arguing the State improperly sought to prevent him from raising a claim of imperfect self-defense. Relying on *Morgan*, defendant contended that because he admitted to stabbing the victim, the charged actions of the underlying predicate felonies were part of the murder itself and could not form the basis of a felony-murder conviction. The State countered that this court's decision in *People v. Davis*, 213 Ill. 2d 459 (2004), affirming a felony-murder conviction predicated on mob action, supported the felony-murder charges against defendant. The trial court denied defendant's motion for directed verdict.

Defendant then called two witnesses in his defense. Melissa Curtis testified that sometime before midnight on December 2, 2005, a few hours before the murder, she was at her house at Cassel Court with her boyfriend, Jeffrey DeBerry, and his brother, Jason DeBerry. The victim and a number of other people were also present. According to Curtis, the victim and Jason argued about money Jason allegedly stole from the victim. After Curtis told them to leave her house, she heard the victim and Jason fighting outside. Curtis looked outside and saw the victim swing a bat and a knife at Jason. Curtis told them she was going to call police officers, and the victim left, and Jason returned to her house. Jason told Curtis the victim hit him in the head with the bat. Curtis acknowledged she later told police officers Jason was in possession of a metal door brace but denied she ever saw Jason threaten the victim with it. Curtis believed Jason and Jeffrey were mad at the victim after the incident. Curtis later saw Jason and Jeffrey leave in a car with defendant.

Cody Bunning testified he was defendant's roommate and that a few hours before the murder he was driving his car with defendant and Patrick DeBerry. While they were in the car, Patrick received a telephone call and then asked Bunning to drive to Cassel Court, and Bunning complied. Upon their arrival, two men exited a house, approached Bunning's car, and got in the back of his car where Patrick was sitting. Bunning did not know the two men.

Once inside Bunning's car, the two men explained they wanted to "go find Dude," but Bunning said he did not want to participate. Bunning drove the group back to the house he shared with defendant. Defendant, Patrick and the two men then left in defendant's car. Later

that night, Bunning spoke to defendant on the telephone on two occasions. During the first conversation, defendant told Bunning they had not found the victim, and defendant wanted to come home. During the second conversation, defendant told Bunning they saw the victim near a police station. Bunning denied that defendant ever told him that defendant feared for his own safety.

According to Bunning, defendant and Patrick returned home sometime after 3 a.m. and acted excited. Defendant told Bunning "we got him good." Defendant explained to Bunning that the victim threatened defendant with a knife, but defendant took the knife and stabbed him. Defendant was in possession of that knife when he returned home, and Bunning saw him take it to the sink and attempt to clean it.

Defendant testified in his own defense and explained that Jason and Jeffrey DeBerry were the men who got inside Bunning's car at Cassel Court. After Bunning drove them back to his house, defendant agreed to let Patrick drive defendant's car to take Jason and Jeffrey back to Cassel Court. Defendant later learned that Patrick had taken one of defendant's softball bats without defendant's permission before Patrick left.

According to defendant, however, the DeBerrys deceived him because they did not return to Cassel Court. Instead, Patrick drove defendant, Jason, and Jeffrey to search for the victim. Defendant did not know the victim. Defendant said the DeBerrys were "talking crazy" and "acting like madmen." Defendant twice called Bunning, once to tell Bunning he would be returning home soon, and the second time he asked Bunning to pick him up. The DeBerrys were angry that defendant was talking on the phone and made him feel uncomfortable.

Eventually, the group located the victim. Defendant agreed to participate only after being physically threatened by Jason and Jeffrey, who stated they would "mess [defendant] up" if he refused. Defendant described the victim as being "a lot bigger" than defendant. Initially, defendant only chased the victim and threw a bat at him. After defendant threw the bat, Jason and Jeffrey ordered defendant to continue chasing the victim, and defendant complied.

-4-

As defendant chased the victim, defendant yelled he was unarmed and wanted to talk. The victim ran slower, and defendant caught up to him. Defendant grabbed the victim's shoulder, and then the victim turned around and tried to stab defendant. Defendant pulled away from the victim, causing the victim to trip over defendant and drop the knife. Defendant recovered the knife, and then the victim produced a second knife. Shortly thereafter, Jason approached on foot, and Patrick drove toward them in the car.

As Jason and Patrick approached, the victim and defendant ran away, with defendant behind the victim. Defendant explained he was attempting to get away from the DeBerrys. Patrick, however, blocked both defendant and the victim with the car. After Patrick stopped the car, the victim turned to defendant and ran toward him, threatening defendant with the knife. To get the victim to drop his knife, defendant stated, he stabbed the victim. Defendant could not recall where he stabbed the victim but believed it was his arms, hands, or shoulders. When the victim dropped his knife, defendant stopped stabbing him and returned to the car. After defendant got to the car, he saw the three DeBerrys stab and beat the victim. Defendant admitted he took the knife home and cleaned it.

On cross-examination, defendant conceded he repeatedly lied to police officers about his involvement in the murder. Defendant also conceded he did not tell police officers the victim had a knife or that the victim tried to stab defendant. Defendant acknowledged he told investigators he "went to jump this guy as a favor" but at trial he testified that his statement was a lie. Defendant further acknowledged he told investigators he lost control of himself that night but explained he did not mean that statement.

At the close of the evidence, but before closing arguments and jury instructions, the trial court allowed the State to nol-pros the knowing and intentional murder charges, leaving defendant charged only with two counts of felony murder. Following closing arguments, the jury convicted defendant of felony murder. The trial court sentenced defendant to 25 years' imprisonment.

On appeal, defendant argued the trial court erred when it denied his motion to dismiss the felony-murder charges and challenged the court's denial of his motion to suppress his statement to police. No. 4–07–0679 (unpublished order under Supreme Court Rule 23). A

majority of the appellate court affirmed defendant's conviction and sentence. The dissenting justice argued defendant's felony-murder conviction should be reversed because the defendant and his co-offenders chased the victim with the intent to kill or harm him, and, thus, the predicate felony and the felony murder shared a common purpose. No. 4–07–0679, at 27-29 (Cook, J., dissenting).

We allowed defendant's petition for leave to appeal. 210 Ill. 2d R. 315.


## II. ANALYSIS

On appeal, defendant argues the offense of mob action improperly served as the predicate forcible felony for his first degree felony-murder conviction. Citing *Morgan*, defendant contends that the trial court erred in denying his motion for directed verdict on the felony-murder charges because the conduct constituting mob action arose from and was inherent in the act of murder itself and did not have an independent felonious purpose. Defendant further contends the State improperly avoided its burden of proving a knowing or intentional murder by solely charging him with felony murder. Because this appeal solely presents a question of law, we review it *de novo*. *People v. Pelt*, 207 Ill. 2d 434, 439 (2003).

The felony-murder statute is intended to limit violence caused by the commission of a forcible felony, subjecting an offender to a first degree murder charge if another person is killed during that felony. *People v. Belk*, 203 Ill. 2d 187, 192 (2003). The offense of felony murder is unique because it does not require the State to prove the intent to kill, distinguishing it from other forms of first degree murder when the State must prove either an intentional killing or a knowing killing. *Davis*, 213 Ill. 2d at 471, citing 720 ILCS 5/9–1(a)(1), (a)(2) (West 2002). Because of this distinction, this court has repeatedly expressed our view that a felony-murder charge may, in effect, improperly allow the State to both eliminate the offense of second degree murder and avoid the burden of proving an intentional or knowing first degree murder because many murders are accompanied by certain predicate felonies. *Davis*, 213 Ill. 2d at 471, citing *Morgan*, 197 Ill. 2d at 447; *Pelt*, 207 Ill. 2d at 441.

Addressing that view, this court has concluded that "where the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder." *Morgan*, 197 Ill. 2d at 447. Consequently, in *Morgan*, we rejected felony-murder charges predicated on the forcible felonies of aggravated battery and aggravated discharge of a firearm for a 14-year-old defendant who fatally shot his grandfather and grandmother because those felonies were inherent in, and arose from, the fatal shootings. The *Morgan* court explained it was arguable that the murders gave rise to the predicate felonies, rather than the predicate felonies resulting in the murders. The *Morgan* court also held that the predicate felony underlying a charge of felony murder must have an independent felonious purpose. *Morgan*, 197 Ill. 2d at 458.

Two years after *Morgan*, this court revisited the issue of what constitutes a proper predicate forcible felony for a felony-murder charge in *Pelt*. The defendant's conduct of throwing his infant son against a bedroom dresser and causing the child's death resulted in a conviction of aggravated battery of a child and first degree felony murder predicated on aggravated battery of a child. In determining that the defendant's conduct was an act inherent in, and arising from, the child's murder, the *Pelt* court explained:

> "Defendant's statement indicated that he was upset when the infant would not stop crying, and that he tried to throw him to the bed. He stated that he apparently threw him too far '[be]cause he hit the dresser.' The act of throwing the infant forms the basis of defendant's aggravated battery conviction, but it is also the same act underlying the killing. Therefore, as in *Morgan*, it is difficult to conclude that the predicate felony underlying the charge of felony murder involved conduct with a felonious purpose other than the conduct which killed the infant." *Pelt*, 207 Ill. 2d at 442.

The *Pelt* court also observed the jury rejected the State's charges of knowing first degree murder and explained that the court's refusal to allow felony murder "ensures that defendant will not be punished as a murderer where the State failed in proving to the jury that a knowing murder occurred." *Pelt*, 207 Ill. 2d at 442. This statement underscores this court's view that felony-murder charges could be

abused by permitting the State to obtain a first degree murder conviction that it could not obtain otherwise.

Following *Pelt*, we next considered whether a predicate felony properly formed the basis of a felony-murder charge in *Davis*, with the charge predicated on the forcible felony of mob action. In *Davis*, the State alleged that a group of 10 to 20 individuals, including the defendant, fatally beat the victim after an argument over a stolen television. The defendant made a statement to police officers admitting he hit the victim a few times, but at trial he denied actually hitting the victim and claimed to have swung only at the victim two times. It was undisputed that the other individuals inflicted many of the victim's injuries. *Davis*, 213 Ill. 2d at 474.

Based on the evidence presented at trial, the *Davis* court concluded the defendant's conduct was not an act inherent in, or arising from, the victim's murder. The court observed the same evidence was not used to prove both the predicate felony of mob action and the murder. Thus, because the case differed from *Morgan* and *Pelt*, the *Davis* court concluded that the predicate felony involved conduct with a felonious purpose other than the conduct that killed the victim, and found mob action properly served as the predicate felony for defendant's felony-murder conviction. *Davis*, 213 Ill. 2d at 474.

In our view, this case most resembles the circumstances presented in *Davis*. As in *Davis*, evidence apart from the actual murder supported defendant's conviction for mob action. An individual commits mob action when he and at least one other person, without lawful authority, act together with the use of force or violence to disturb the public peace. 720 ILCS 5/25–1(a)(1) (West 2004).

Here, the evidence showed that a few hours before the murder occurred the victim fought with one of defendant's co-offenders over stolen money. It was undisputed that sometime after the fight defendant and his co-offenders searched for the victim and, after locating him, pursued him on foot and by car. Defendant admitted he threw a bat at the victim during the pursuit. Defendant also engaged in some sort of physical interaction with the victim when he first caught up to the victim during the pursuit, causing the victim to fall and drop a knife. Defendant stabbed the victim only toward the end of the pursuit. After stabbing the victim, defendant retreated and

watched his three co-offenders repeatedly stab and hit the victim with a bat. This evidence supports a conclusion that defendant acted with other individuals to use force or violence to disturb the public peace, completing the predicate felony of mob action, before the end of the aggression that eventually resulted in the victim's death.

Furthermore, defendant did not claim he intended to kill the victim. Although defendant testified he was coerced into participating, he conceded on cross-examination that he told investigators he participated "as a favor" to his co-offenders. Regardless of whether he was coerced or a willing participant, however, the evidence shows defendant, in fact, participated in the group pursuit and use of force against the victim. Consequently, we conclude defendant acted with the felonious purpose to commit mob action. See *Morgan*, 197 Ill. 2d at 458 ("the predicate felony underlying a charge of felony murder must have an independent felonious purpose").

Moreover, unlike *Morgan* and *Pelt*, defendant's conduct constituting the mob action was neither inherent in, nor arose from, the murder itself. Instead, the evidence established the victim died as the result of cumulative blood loss from the 20 stab wounds inflicted by defendant and his three co-offenders, rather than any particular wounds inflicted by defendant alone. See *Davis*, 213 Ill. 2d at 475, citing *People v. Viser*, 62 Ill. 2d 568 (1975) (both cases allowing felony-murder charges predicated on felonies involving the defendants' participation in fatal group attacks on the victims when there was no clear evidence the defendants caused the fatal injuries). Accordingly, as in *Davis*, we conclude the charged predicate felony of mob action properly formed the basis of defendant's felony-murder conviction.

The State urges this court to reject the same-act or merger doctrine for felony murder, and overrule *Morgan*, *Pelt*, and *Davis* to the extent they adopted the doctrine. The State advocates a test that focuses solely on whether the defendant acted with a felonious purpose distinct from an intent to kill his victim, without considering whether the act underlying the predicate felony was inherent in the murder itself.

Although in *Morgan* we considered whether the acts constituting the predicate felony arose from, and were inherent in, the murder

itself, our consideration was based on the view that the State could effectively eliminate its burden of proving an intentional or knowing murder in any fatal shooting case. *Morgan*, 197 Ill. 2d at 447. Nonetheless, in our conclusion, we expressly agreed "with the appellate court's holding that the predicate felony underlying a charge of felony murder must have an independent felonious purpose." *Morgan*, 197 Ill. 2d at 458.

Similarly, in *Pelt* and *Davis*, we again expressed our view that felony-murder charges could potentially enable the State to eliminate second degree murder, or to eliminate altogether the need to prove an intentional or knowing murder. *Pelt*, 207 Ill. 2d at 441; *Davis*, 213 Ill. 2d at 471-72. Ultimately, however, in both *Pelt* and *Davis*, this court considered whether the predicate felony involved conduct with a felonious purpose apart from the killing itself. *Pelt*, 207 Ill. 2d at 442; *Davis*, 213 Ill. 2d at 474.

Therefore, this court has consistently recognized that the predicate felony underlying a charge of felony murder must have an independent felonious purpose. *Morgan*, 197 Ill. 2d at 458; *Pelt*, 207 Ill. 2d at 442; *Davis*, 213 Ill. 2d at 474. In addition, we also carefully considered whether the State improperly used felony-murder charges to avoid the burden of proving an intentional or knowing murder. *Morgan*, 197 Ill. 2d at 447; *Pelt*, 207 Ill. 2d at 441; *Davis*, 213 Ill. 2d at 473-74. Despite the State's invitation to abandon the latter consideration, we continue to adhere to these principles.

### III. CONCLUSION

Consistent with *Davis*, we conclude the offense of mob action properly served as the predicate felony for defendant's felony-murder conviction. For the foregoing reasons, we affirm the appellate court's judgment.

*Appellate court judgment affirmed.*

JUSTICE GARMAN, specially concurring:

I agree with the majority that in this case the defendant was properly convicted of felony murder predicated on mob action. I also agree with the majority's conclusion that this court has long recognized that the predicate felony underlying a charge of felony murder must have an independent felonious purpose. Slip op. at 10. However, I write separately because this focus on an independent felonious purpose is undermined by the majority's decision to decline either to expressly adopt or reject the same-act doctrine. In this way, the majority confuses, rather than clarifies, the issue for prosecutors and courts.

As I outlined in a special concurrence in *Davis*, jurisdictions throughout the United States have adopted different approaches for determining whether a particular felony may properly serve as a predicate offense for felony murder. One of those methods is the same-act doctrine. Under this doctrine, application of the felony-murder rule is precluded whenever the act that constitutes the predicate felony is the same act that results in the death of the victim.

This court has not expressly adopted the same-act doctrine. Indeed, this court's decision in *People v. Viser* stands as a *de facto* rejection of the doctrine. In *Viser*, this court affirmed the defendant's felony-murder conviction even where the victim's death was caused by the same acts that constituted the predicate aggravated battery. Since *Viser*, however, our line of cases on this issue has strayed from a focus on the *intent* of the defendant to a focus on the *act* or *acts* committed by the defendant.

In *People v. Morgan*, the court first reached the conclusion, recognized by the majority in this case, that the predicate felony underlying a charge of felony murder must have an independent felonious purpose. *Morgan*, 197 Ill. 2d at 458. However, elsewhere in the opinion, the court concluded that "where the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder." *Morgan*, 197 Ill. 2d at 447. As I later noted in my partial dissent in *Pelt*, the use of this phrase altered, perhaps

-11-

unintentionally, the focus of the inquiry.[2] *Pelt*, 207 Ill. 2d at 445 (Garman, J., concurring in part and dissenting in part). The effect of this change in focus was to shift the analysis to one consistent with the same-act doctrine. Under this language from *Morgan*, a defendant may not be convicted of felony murder unless he performs a separate felonious act in addition to the act that causes the death.

*Pelt* provided an opportunity to clarify *Morgan*, and return the focus of the inquiry to the defendant's intent. However, the *Pelt* majority, citing *Morgan*, focused on whether the predicate felony "involved *conduct* with a felonious purpose other than the *conduct* which killed the infant." (Emphases added.) *Pelt*, 207 Ill. 2d at 442. In that case, the single act of throwing the infant was held to be both the basis for the aggravated battery conviction and the act underlying the killing. *Pelt*, 207 Ill. 2d at 442. Thus, the aggravated battery could not serve as a predicate offense for felony murder.

The result of the *Pelt* analysis, as I noted in a concurrence in *Davis*, is that to be a predicate felony for felony murder, the felony "must not only have a felonious purpose apart from killing the victim *** but also must involve at least two separate acts." *Davis*, 213 Ill. 2d at 493 (Garman, J., concurring). This is the definition of the same-act doctrine. I noted at that time that if this doctrine were to be adopted by the court, it should do so "unequivocally and thereby give clear guidance to prosecutors and trial courts." *Davis*, 213 Ill. 2d at 495 (Garman, J., concurring).

In the present case, this court again has the opportunity to clarify *Morgan* and its progeny and do one of two things. First, the majority could return the felony-murder analysis to the proper question–whether the defendant acted with the purpose of committing an independent felony apart from the homicide. The majority ostensibly has done so when it reaffirms that the court has "consistently recognized that the predicate felony underlying a charge of felony murder must have an independent felonious purpose." Slip

---

[2]Later, in *Davis*, I also noted that the *Morgan* court incorrectly attributed the "inherent in" language to the appellate court majority, rather than to the appellate concurrence. Correct or not, however, this language has now been adopted by this court and must be addressed.

op. at 10. Nonetheless, the majority also undermines its conclusion by repeatedly referencing, with approval, that language from *Morgan*, *Pelt* and *Davis*, and implicitly relying on what is, in effect, a formulation of the same-act doctrine.

The second alternative would be for the court to expressly adopt the same-act doctrine. The majority already conveys, if unintentionally, an adherence to its principles. For example, the way the majority structures and prioritizes this court's conclusions from *Morgan* reveals its unspoken reliance on the same-act doctrine. Rather than lead with the court's holding in *Morgan*, which emphasized the need to demonstrate an independent felonious purpose, the majority begins its summary of *Morgan* by citing the "arise from" and "inherent in" language. The majority's discussions of *Morgan*, *Pelt* and *Davis* also reinforce the doctrine, framing the issue in terms of acts, conduct, or "same evidence."

I would disagree with the adoption of the same-act doctrine, for the reasons I set forth in *Davis*. *Davis*, 213 Ill. 2d at 495-97 (Garman, J., concurring). However, adopting the doctrine expressly would surely be more helpful to the bench and bar than the course the majority continues to take. As it stands, the majority declines to adopt the doctrine in name. Instead, the majority purports to embrace a standard based on intent while also imposing a requirement that there must be both an act that constitutes a forcible felony and a separate act that results in the victim's death.

In the present case, the majority's analysis does not affect the result. As the majority notes, defendant and his friends first chased down the victim. Defendant then threw a bat at the victim. Ultimately, defendant stabbed the victim at least once. Slip op. at 8. There is no doubt that defendant acted with the intent to commit mob action. Further, because defendant committed several acts, including throwing the bat and stabbing the victim, the majority's additional standard can also be met. Thus, here, under either an intent standard or under the majority's analysis, defendant's conviction is upheld.

Suppose, however, that defendant and his friends searched for the victim with the same intent they had in this case, to "g[e]t [the victim] good," but when they found him, defendant struck only one blow as his friends restrained the victim, and that blow resulted in his death. Under the same-act doctrine and under the majority's analysis, a

-13-

felony-murder conviction could not stand. Although defendant would have been acting with an independent felonious purpose, the act proving the felony would have "arisen out of" and been "inherent in" the act of murder itself.

This is not the result intended by our legislature. Our legislature has clearly expressed the intent that when a defendant intends to commit a forcible felony, his committing that felony is a sufficient basis to impose liability for murder if the victim dies as a result. There is nothing in the statute that would impose felony-murder liability on the defendant who strikes the victim multiple times, but not impose liability on the defendant who strikes the victim only once.

The majority's approach continues to obscure the felony-murder analysis. Therefore, I would again suggest that when the next case arises, this court should either expressly adopt the same-act doctrine, and overrule *Viser*, or expressly reject it and return the focus of our inquiry to whether the defendant acted for the purpose of committing an independent felony apart from the homicide.

JUSTICE BURKE joins in this special concurrence.